IP PETROLEUM COMPANY,
INC., Appellant,

v.

WEVANCO ENERGY, L.L.C.; David L. Neal, Individually and as Administrator of the Estate of Frances Neal; Mark Schoomaker; Jane Schoomaker; Bonnie Vaughan; and Martin Phillips, Appellees.

Wevanco Energy, L.L.C.; David L. Neal, Individually and as Administrator of the Estate of Frances Neal; Mark Schoomaker; Jane Schoomaker; Bonnie Vaughan; and Martin Phillips, Appellants,

v.

IP Petroleum Company, Inc., Appellee.

No. 01–02–00106–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 11, 2003.

Allen D. Cummings, Kent Geoffrey Rutter, Larry Huelbig, Haynes & Boone, L.L.P., Houston, for appellant.

Timothy F. Lee, Don Jackson, Ware, Snow, Fogel, Jackson & Greene, Bill Robins, Robins, Cloud & Lubel, L.L.P., Houston, for appellees.

Panel consists of Chief Justice RADACK and Justices NUCHIA and HANKS.

## OPINION ON REHEARING

GEORGE C. HANKS, Jr., Justice.

We withdraw our opinion of May 8, 2003 and issue the following in its stead. The plaintiffs motion for rehearing is denied.

A jury found that IP Petroleum Company, Inc., appellant, was grossly negligent when it breached its contract with Wevanco Energy, L.L.C.; David L. Neal, Individually and as Administrator of the Estate of Frances Neal; Mark Schoomaker; Jane Schoomaker; Bonnie Vaughan; and Martin Phillips (collectively, "the plain-

tiffs"). In 11 points of error, IP argues that it did not breach the contract and the award of lost profits and attorneys' fees was improper. The plaintiffs appeal the trial court's refusal to award prejudgment interest on purely economic damages. We reverse and render judgment that the plaintiffs take nothing.

## Factual and Procedural Background

### The Kerans Theory

In 1993, Dr. Don Snyder read a scientific article in an issue of a professional association bulletin. The article, entitled "Karst–Controlled Reservoir Heterogeneity in Ellenburger Group Carbonates of West Texas," was written by a geologist, Charles Kerans. It proposed an unconventional new approach to drilling for oil in West Texas.

The article was based on a theory of "karsting," or cave formation, in the Ellenburger Formation in West Texas. According to the Kerans theory, millions of years ago, caves were formed in West Texas and were slowly filled with sediment. Over time, new rock was formed on top of the caves, collapsing the roofs of the caves and slowly burying the collapsed caves far below the surface. Kerans theorized that the buried, collapsed caves created three distinct strata in the Ellenburger Formation—a "cave roof" zone, a "cave fill" zone, and a "cave floor" zone. Both the cave roof and cave floor zones contain oil, Kerans opined, but existing wells had tapped only the oil in the cave roof zone. According to Kerans, if oil wells were drilled deeper into the Ellenburger Formation, through the cave roof zone and the unproductive cave fill zone, those wells might

produce oil if they tapped into a productive area of the cave floor zone.

The Kerans theory marked a significant departure from the conventional approach to drilling in the Ellenburger Formation. The conventional approach, known as the "scratch and sniff" method, was to drill only to the very top of what Kerans called the cave roof zone and siphon off any oil. The concern was that if a well was drilled any deeper, it would be inundated by a zone of water.

### The Millard E–2 Well

Dr. Snyder decided to test the Kerans theory on the Millard E–2 well in the Penwell Field in Ector County. In 1955, Phillips Petroleum Company had drilled the Millard E–2 to a total depth of 8600 feet—just a few hundred feet short of where Kerans theorized the oil-rich cave floor zone might be found. Dr. Snyder believed that the Millard E–2 presented an opportunity to test the Kerans theory at relatively low cost. Phillips executed a "farmout agreement" with Dr. Snyder, allowing him to deepen the well.[1]

### The Investors

Dr. Snyder approached Richard Reeve, the owner of Cleveland Oil Company. The two men had previously worked together on several projects. Cleveland Oil paid Snyder $40,000, and Reeve agreed to have Cleveland Oil find investors in exchange for a four percent overriding royalty interest. Cleveland Oil did not have to pay any of the drilling costs, but would receive four percent of the profits.

The promotional materials Cleveland Oil sent to prospective investors indicated that "this is a wildcat test."[2] The materials

---

1. Phillips did not charge Snyder for the farmout agreement, but it did retain a royalty interest in the well.

2. We have previously defined a "wildcat" well as "a speculative well that does not offer a reasonable expectation of profit to a reasonably prudent operator under the same or similar facts and circumstances." *See Sun Ex-*

also indicated that "mechanical risk is present in re-entries." This risk disclosure was made because the Millard E-2 had been abandoned for 50 years and it was impossible to predict how badly the well had deteriorated.

Frank Cox, the managing member of Wevanco Energy, L.L.C. had invested with Reeve in the past, and Cox decided that Wevanco would invest in the Millard E-2. Cox's accountant, David Neal, also invested, as did several of Neal's friends and family members.

**Selection of IP Petroleum**

Snyder, Reeve, and Cox chose IP as the operator of the well. Snyder presented the proposal to Dr. Mike Senich, a project geologist at IP. Dr. Senich reviewed the promotional materials and found one sentence in the solicitation letter to be of particular interest—"Other than for faulting, the Cave Roof is thought to be reasonably continuous across a field, while the Cave Floor zones are more heterogeneous much like Permian age rock." Dr. Senich testified that he understood this to mean that if the cave floor contained any oil at all, it might be productive in some areas but unproductive in others. He estimated that the chances of success for the Millard E-2 were one in ten, or possibly one in five.

Scott Nonhof, an engineer, conducted a petroleum engineering analysis on the well. Nonhof's handwritten notes indicate: " *Bottom Line—Don't have any production data worth a flip.... This *is* a *WILDCAT* not supported by Production Data but risk to reward is very high. Supper [*sic*] low cost to do reentry."

IP agreed to participate, and IP and Cleveland Oil signed a participation letter agreement that described the objective of the project to "deepen the Phillips Petroleum Millard E # 2 from its current TD of 8626' to +/− 9000' to test the Ellenburger Cave Floor Zone." IP also agreed to pay 50 percent of the drilling costs, in exchange for a 50 percent share of the profits if the project were to succeed.

**The Joint Operating Agreement**

Before drilling began, Cleveland Oil, IP, and all the investors executed a comprehensive Joint Operating Agreement (JOA). The JOA is a form contract promulgated by the American Association of Petroleum Landmen and is used throughout the industry. The two provisions of the JOA that are at issue in this case provide as follows:

> [IP, as the operator would] continue the drilling of the well with due diligence to a depth of 9125' below the surface of the ground or a depth sufficient to test the Lower Ellenburger Formation, whichever is lesser, unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.
>
> . . . .
>
> [IP] shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**The Drilling**

On December 3, 1997, IP began drilling the Millard E-2, and, as warned in the promotional materials, IP encountered mechanical difficulties that ultimately increased the costs of drilling to $383,000, instead of $282,625 as originally projected.

*ploration & Prod. Co. v. Jackson,* 715 S.W.2d 199, 202 (Tex.App.—Houston [1st Dist.] 1986), *rev'd in part on other grounds,* 783 S.W.2d 202 (Tex.1989).

IP paid all drilling expenses as they were incurred, expecting a pro rata reimbursement from the other investors in accordance with the JOA.[3]

On the evening of December 31, 1997, Reeve, Senich, and Snyder were losing hope because they were nearing the target depth, and there were no signs of oil. At about 10 p.m., the mudlogger approached the three men and asked what they wanted him to do with the oil and gas "shows" in the sample.[4] Dr. Senich testified he was surprised to have had shows at this depth—he thought they had already drilled too deep and were past the area where he expected to find oil and gas. Likewise, Snyder testified he thought they had a dry hole "because we had drilled past the point that I had predicted that we would encounter this lower collapse zone."[5] Dr. Senich testified that, in general, operators know that it is critical not to drill past the spill point because, once a well taps into water, it will produce only water and not oil. Dr. Snyder was convinced, based on the Kerans theory, that the well was already past its spill point, and Dr. Senich also thought it was too deep. Most of IP's employees testified that the Millard E–2 was drilled to a depth sufficient to test the Lower Ellenburger, but the plaintiffs' experts testified to the contrary.

**The Agreement to Complete the Well**

The shows were good news, but they presented a dilemma. In order to run a test and determine whether the shows actually indicated significant quantities of oil, it would be necessary to set pipe to reinforce the side of the well hole. Setting pipe would narrow the hole, and because of the depth and the age of Millard E–2, the hole was narrow already. After a test was run and the hole was narrowed, it would remain physically possible to deepen the well further, but additional drilling would be pointless. By then, the well would be so narrow that it would be virtually impossible to extract oil from the well in paying quantities.[6]

Cox consulted with Neal and then urged Dr. Senich to run the test immediately. Dr. Senich testified that Cox and Snyder "wanted to stop immediately" at about the 9000' mark, but Senich wanted to drill a little bit further to allow room for the tools that test the well. IP ultimately drilled the well to 9015'.

IP delivered "completion letters" to each investor, which stated in pertinent part that "IP ... hereby recommends ... attempting an open hole completion in the Ellenburger formation in the interval of 8,947'—9,010'.... Should you elect to participate, please evidence your election in the space provided." Each investor signed the completion letters. Cox, however, testified that he thought the E–2 could still be deepened if IP had not reached the Lower Ellenburger. David Neal testified that he signed the letters because he understood them to mean IP had "found the zone."

---

**3.** In fact, the investors did not reimburse IP, and IP brought a counterclaim seeking reimbursement. The jury awarded IP $129,819 in addition to its attorneys' fees.

**4.** An oil and gas "show" means that well cuttings emerging from the well hole are showing signs of oil.

**5.** Dr. Senich explained the underground case structure as "an inverted salad bowl....

That's your reservoir. You know oil floats on water, so it can migrate in this salad bowl and fill it up. When it reaches the lip of that bowl, that bowl can't hold any more so it spills out. That's your spill point."

**6.** The plaintiffs contend that IP could have tested the E–2 well with a drill stem test, which would not have required setting pipe in the well.

The tests indicated that the well would produce three percent oil and 97 percent water, a mix that would not produce oil in paying quantities.

## The Aftermath

Upon hearing the test results, Cox demanded that IP drill the well deeper. Glynn Broussard, a land man and team leader for IP, testified that Cox refused to take "no" for an answer and, at one point, Broussard told Cox that "IP felt like we had a dry hole and it was—we were done and we weren't going to pursue drilling the well any deeper. If he wanted to drill the well deeper, he had every right to." Neither Wevanco nor any other investor exercised its right under the JOA to take over the well. Cox, however, testified that IP misled him into believing IP intended to deepen the well.

In July 1998, IP gave notice of its intent to plug and abandon the well. In accordance with the JOA, at that time, the plaintiffs were given an election either to agree to the abandonment or to disagree and take over the well. The plaintiffs refused to select either option. Thus, the plaintiffs had at least two opportunities— when the completion was proposed and when the abandonment was proposed—to deepen the Millard E–2 themselves and to retain all the profits. They rejected both opportunities.

The plaintiffs argued that they had no motivation to produce oil from the Millard E–2 without a P–4—a regulatory form filed with the Railroad Commission that allows an operator to sell oil from a well. The P–4 on the Millard E–2 gave IP the sole authority to sell oil on the well. The plaintiffs contended that IP was "intentionally holding the rights to the well hostage" until the plaintiffs reimbursed IP for the drilling expenses it believed it was due under the JOA.

## The Trial

The plaintiffs sued IP, alleging that IP breached its alleged obligation to further deepen the Millard E–2; and IP counterclaimed, seeking reimbursement for its drilling expenses under the JOA. The jury found that IP failed to drill to a depth sufficient to test the Lower Ellenburger Formation and that the failure was the result of gross negligence or willful misconduct. The jury also found that IP had breached the participation letter agreement and that none of the plaintiffs had agreed to the completion of the wells.

The jury found that, had IP deepened the Millard E–2 to a sufficient depth, the plaintiffs would have realized a profit of $534,274. The jury then found that, had the Millard E–2 been a success, the plaintiffs would have realized an additional profit of $3,560,000. The jury also awarded $1,424,000 in attorneys' fees through trial and $178,000 in appellate attorneys fees.

### JOA Breach

In issue four, IP asserts that the evidence was legally and factually insufficient to support the jury's finding that IP's alleged failure to drill to a sufficient depth under the JOA was the result of gross negligence or willful misconduct.

#### Exculpatory Clause

■ The exculpatory clause in the JOA establishes a standard of care applicable to drilling operations, but then provides that, if an operator falls short of this standard, it will not be liable, in the absence of gross negligence or wilful misconduct. The clause provides in pertinent part that:

> IP Petroleum Company, Inc. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of *all operations on the Contract Area* as permitted and required by, and

within the limits of this agreement. It shall conduct *such operations in a good and workmanlike manner*, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except as may result from gross negligence or willful misconduct. . . .

(Emphasis added.) The plaintiffs globally contend that this clause can never apply to any breach of contract claim against an operator and therefore the clause does not apply to its claims against IP. We disagree.

■ Generally, exculpatory clauses in a contract are utilized to exempt one party from future liability for negligence. *See Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267 (Tex.1974). We have found only two cases discussing exculpatory clauses with respect to liability for breach of contract. *See Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147 (Tex.App.—Eastland 2001, pet. filed); *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741 (Tex.App.—El Paso 2000, no pet.).

In *Cone*, the court was faced with an exculpatory clause in a joint operating agreement identical to the one that we have before us in this case. *See Cone* 68 S.W.3d at 154. The court noted that, in the operating agreement, the language requiring a showing of gross negligence and wilful misconduct to establish liability immediately followed the provision requiring the operator to conduct its drilling operations in a good and workmanlike manner. *Id.* at 155. Cone's breach of contract claim, however, did not allege the failure of the operator to operate in a good and workmanlike manner. In *Cone*, the operator was alleged to have breached the joint operating agreement by improperly assessing certain charges against an investor's account and the breach of contract claims were in the nature of an accounting.

*Id.* Therefore, the Eastland Court of Appeals held that the exculpatory clause did not apply to Cone's breach of contract claims against the operator. *Id.*

In *Abraxas*, the court determined that an exculpatory clause provision identical to the one before us was unambiguous. *Abraxas Petroleum Corp.*, 20 S.W.3d at 759. In determining the scope of this exculpatory clause, the court noted that the clause was found in an article which concerned the operator's authority to conduct operations in the contract area. *Id.* More significantly, in the clause, the operator's limitation of liability is directly linked to the imposition of the duty to act as a reasonably prudent operator, which strictly concerns the manner in which the operator conducts drilling operations on the lease. *Id.* The breach of contract claims, however, did not allege that Abraxas failed to act as a reasonably prudent operator nor did they allege any misconduct arising from the manner in which the operator conducted drilling operations on the lease. In *Abraxas*, the operator was alleged to have breached the joint operating agreement by improperly sending "authorization for expense" letters to investors for expenses associated with routine repairs and the breach of contract claims concerned the operator's administrative duties under the JOA. *Id.* Therefore, the El Paso Court of Appeals held that the exculpatory clause did not pertain to the breach of contract claims against the operator.

Here, the basis of the plaintiffs' claims is alleged misconduct arising from the manner in which IP, as operator, conducted drilling operations on the lease. Unlike in *Cone* and *Abraxas*, the plaintiffs alleged that IP failed to conduct operations in good and workmanlike manner and failed

to act as a reasonably prudent operator.[7] In paragraphs 22 and 23 of its Second Amended Original Petition, the plaintiffs alleged the following:

### BREACH OF CONTRACT

22. Pursuant to the express terms of the Farmout Agreement, Joint Operating Agreement, and Participation and Purchase and Sale Agreement, [IP] was required to conduct its activities *as a reasonably prudent operator, in a good and workmanlike manner, and with due diligence.* [IP] breached these duties, and further, acted with gross negligence or with wilful misconduct.

23. [IP] further breached its agreement with [the plaintiffs] by failing to drill and deepen the oil and gas well in question to the Contract Depth as defined in the Farmout Agreement, Joint Operating Agreement, and the Participation and Purchase and Sale Agreement. Specifically, with regard to the contract depth, [IP] as successor to the Cleveland Oil Company, had the duty to (1) prosecute the re-entry of the test well to its objective depth (as described in Exhibit "A" to the Participation and Purchase and Sale Agreement) *with due diligence and in a good and workmanlike manner;* and (2) accept responsibility for losses sustained by [the plaintiffs] resulting from [IP's] gross negligence or from breach of its obligations under the Participation and Purchase Sale Agreement.

(Emphasis added.) Accordingly, the exculpatory clauses in the JOA applied, and the plaintiffs had to establish that IP was grossly negligent or acted with wilful misconduct when it breached the contract. *See Cone,* 68 S.W.3d at 155; *Abraxas Petroleum Corp.,* 20 S.W.3d at 759.

### Standard of Review

 In reviewing a legal sufficiency challenge, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If more than a scintilla of evidence exists, the evidence is legally sufficient. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). To rise above a scintilla, the evidence offered to prove a vital fact must do more than create a mere surmise or suspicion of its existence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). In determining legal sufficiency, we consider whether the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994).

### Gross Negligence or Willful Misconduct

 The jury affirmatively answered the following question:

Did IP Petroleum Company, Inc.'s failure to drill to a depth sufficient to test the Lower Ellenburger Formation result from gross negligence or willful misconduct?

"Gross negligence or willful misconduct" means:

---

7. The Court also disagrees with the plaintiffs' contention that these issues were never tried to the jury. At trial, the jury was asked, "Did IP Petroleum, Inc. fail to drill to a depth sufficient to test the Lower Ellenburger Formation?" This broad submission of the breach of contract issue included the allegations set forth in the Second Amended Petition.

(a) a specific intent by IP Petroleum Company Inc. to cause substantial injury to Plaintiffs; or

(b) an act or omission by IP Petroleum Company, Inc.,

 (i) which, when viewed objectively from the standpoint of IP Petroleum Company, Inc. at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

 (ii) of which IP Petroleum Company, Inc. had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.[8]

This was a significant finding because, under the JOA, for IP to be found liable, the jury had to have found that IP was grossly negligent or acted with willful misconduct.

 To support a finding of gross negligence, there must be evidence that IP had "actual subjective knowledge of an extreme risk of serious harm." *Moriel,* 879 S.W.2d at 22. The magnitude of the risk is judged from the viewpoint of the defendant at the time the events occurred. *Id.* at 23. The harm anticipated must be extraordinary harm, not the type of harm ordinarily associated with breaches of contract or even with bad faith denials of contract rights; harm such as "death, grievous physical injury, or financial ruin." *Id.* at 24; *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.,* 907 S.W.2d 904, 911 (Tex.App.—Houston [1st Dist.] 1995, writ denied).

Here, the plaintiffs, who were seeking monetary lost profits, summarize the evidence to support the jury's finding of gross negligence as follows:

IP apparently did not prepare a written drilling plan for the E–2, which is the normal procedure, and could not explain its failure to do so.

IP got stuck during the drilling operation because of its failure to use drilling mud and spent over $100,000 trying to get unstuck.

IP did not run a drill stem test on the E–2, which many witnesses testified would be the customary, reasonable and prudent thing to do and Wevanco's witnesses testified would have shown that the well was not in the Lower Ellenburger.

IP failed to tell Cox and Wevanco it thought setting pipe would mean the E–2 could not be deepened if it were not productive.

IP told Cox and others that it was considering deepening the E–2 well when it had absolutely no intention of doing so.

IP allowed the farmout to expire while it was still operating, discovered that fact, and did not do anything about it, requiring Cox to obtain a second farmout to protect the investors' rights in the E–2.

IP, against the advice of Cox, unsuccessfully attempted to set an inflatable bridge plug down hole.

IP obtained the P–4 on the well, which the jury could reasonably conclude was at best intended to hold up Wevanco over the issue of the unpaid drilling expenses and at worst a deliberate at-

---

8. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (Vernon 1997) (defining "malice"). On appeal, the plaintiffs allege that this was an improper definition that imposed a "more rigorous standard" on them. The plaintiffs concede that they did not object to the definition at trial; therefore, we are bound to review the evidence in light of the definition submitted to the jury. *See City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 71 (Tex. 2000).

tempt to prevent Cox from deepening the E–2.

■ While this may be legally sufficient evidence of negligence, this evidence does not rise to the level of gross negligence as defined in the jury charge. Nor was there evidence of willful misconduct. "Throughout the history of Texas law, 'willful misconduct' has been defined in a manner akin to 'gross negligence.'" *Marshall Indep. Sch. Dist. v. U.S. Gypsum Co.*, 790 F.Supp. 1291, 1300 (E.D.Tex.1992). Thus, as the jury instruction indicated, a finding of willful misconduct required evidence of "a specific intent by IP Petroleum Company Inc. to cause substantial injury to Plaintiffs." We hold that the evidence is legally insufficient to support the jury's finding. We sustain issue four.

## JOA

■ In issue one, IP argues the plaintiffs' claim for breach of the JOA was without merit as a matter of law. The JOA states that IP "shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct."

Having held there was no evidence of gross negligence or willful misconduct, we sustain IP's issue one.

Because we have sustained IP's issues one and four, which are dispositive of the plaintiffs' claims that IP breached the JOA, we need not consider IP's issues two, three, five, and six as those issues are moot.

## Participation Letter Agreement

In issue seven, IP contends that Texas law precludes any liability to the plaintiffs under the participation letter agreement.

The jury affirmatively answered the following question:

> Did IP Petroleum, Inc. fail to comply with the following agreement?
>
>> Deepen the Phillips Petroleum Millard E # 2 from its current TD of 8626' to +/− 9000' to test the Ellenburger Cave Floor Zone.... The well will be deepened from the depleted Ellenburger Cave Roof, through the dense Ellenburger Cave Fill interval, then test the objective, the Ellenburger Cave Floor.

The "agreement" from which the excerpt was taken was the participation letter agreement—a contract entered into between IP and Cleveland Oil.[9] IP argues that, for two reasons, this was an improper question to submit to the jury: (1) the plaintiffs were not parties to the participation letter and cannot seek to enforce it, and (2) the participation letter agreement was superseded by the JOA.

■ The participation letter agreement was drafted by Cleveland Oil and signed by a land manager from IP. The plaintiffs contend that they signed essentially identical agreements with Cleveland Oil, but they were unable to produce any copies of the signed agreements at trial. They did, however, produce an unsigned copy which was admitted into evidence.

■ Generally, a plaintiff may not enforce a contract to which he is not a party. *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex.2002). However, a third party may recover on a contract made between other parties only if the parties intended to secure a benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit. *Id.* "The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or

9. IP objected to the submission of this jury question.

enforcement by the third party must be denied." *MCI Telecomm. Corp. v. Texas Utils. Elec. Co.,* 995 S.W.2d 647, 651 (Tex. 1999). Any doubt is resolved against a finding that the party was intended to be a third-party beneficiary. *Mandell v. Hamman Oil & Ref. Co.,* 822 S.W.2d 153, 161 (Tex.App.—Houston [1st Dist.] 1991, writ denied). To determine the parties' intent, courts must examine the entire agreement when interpreting a contract and give effect to all the contract's provisions so that none are rendered meaningless. *Stine,* 80 S.W.3d at 589.

Shortly after IP signed the participation letter agreement with Cleveland Oil, Richard Reeve, Cleveland Oil's owner, sent IP a letter outlining the "burden clarification of the [Penwell] prospect (as described in that participation agreement dated 10/31/97 between The Cleveland Oil Company, L.L.C. ... and IP....)." In this letter, Reeve explains that "IP shall serve as Operator. IP will maintain the same spirit of operations as would Cleveland, where the Operator is operating for the benefit of all parties...." Stephen Gui-

dry, IP's land manager, signed this burden clarification. We hold that this clarification indicates that the plaintiffs were third-party beneficiaries of the participation agreement between IP and Cleveland Oil.

■■■ IP argues that the participation agreement was superceded by the JOA because the two agreements contain inconsistent drilling obligations and gross negligence provisions.

■■■ Instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times. *Ft. Worth Indep. Sch. Dist. v. City of Ft. Worth,* 22 S.W.3d 831, 840 (Tex.2000). Only when the terms of one contract are so inconsistent with those of the other that the two cannot subsist together is there a presumption that the second superceded the first. *Willeke v. Bailey,* 144 Tex. 157, 189 S.W.2d 477, 479 (1945).

We must examine the two agreements and their respective drilling obligations.

| Participation Letter Agreement | JOA |
|---|---|
| "Deepen the Phillips Petroleum Millard E # 2 from its current TD of 8626' to +/− 9000' to test the Ellenburger Cave Floor Zone." | "[IP] shall thereafter continue the drilling of the well with due diligence to a depth of 9125' below the surface of the ground or a depth sufficient to test the Lower Ellenburger Formation, whichever is lesser ... unless all parties agree to complete or abandon the well at a lesser depth." |

The participation letter agreement only addresses drilling to a depth necessary to test the Ellenburger Cave Floor Zone. The JOA, however, authorized IP to stop drilling at 9125' even if it believed it had not yet reached the Lower Ellenburger Formation. Furthermore, the JOA authorized IP to stop drilling at a lesser depth if all parties agreed to complete or abandon the well.

The letter agreement does not allow a consensual completion of the drilling at

any point above the Ellenburger Cave Floor Zone. If the parties had signed the completion letters with the understanding that IP had not yet reached the Ellenburger Cave Floor Zone, IP would have been in violation of the participation letter agreement. As such, the two agreements contain mutually inconsistent terms.

We hold that the JOA superseded the participation letter agreement.

We sustain issue seven.

In issue eight, IP argues that, even under the participation letter agreement, it is not liable to the plaintiffs.

Having held that the JOA superseded the participation letter agreement, issue eight is moot.

### Damages

In issue nine, IP asserts that the plaintiffs failed to establish lost-profits damages with "reasonable certainty" where the lost profits damages were based on (1) a "wildcat" prospect drilled to test a new and unproven scientific theory and (2) seven additional hypothetical wells. In issue 10, IP contends that the trial court erred by awarding attorneys' fees to the plaintiff. In issue 11, IP argues that the trial court erred by awarding prejudgment interest to the plaintiffs.

Having held that there was legally insufficient evidence to establish that IP breached the JOA, and having held that the JOA superceded the participation letter agreement, we hold that the plaintiffs are not entitled to damages, attorneys' fees, or prejudgment interest.

We sustain issues 9, 10, and 11.

### Future Damages

In their sole point of error, the plaintiffs argue that the trial court erred when it refused to award prejudgment interest on the future damages awarded for lost profits.

Damages, in this case, are contingent on the breach of contract finding. We have held there was legally insufficient evidence to establish that IP breached its contract.

We overrule the plaintiffs' sole point of error.

### Conclusion

We reverse the judgment of the trial court and render judgment that the plaintiffs take nothing. We affirm the remainder of the trial court's judgment.