

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00059-CV

**CONTINENTAL MOTORS, INC.,**
Appellant

v.

**DANBURY AEROSPACE, INC.,** Airmotive Engineering Corporation, Engine Components International, Inc., EC Services, Inc., Precision Machined Airparts, Inc., Sterling Machinery & Process, Inc., and Aircooled Motors, Inc.,
Appellees

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2016CI18283
Honorable Norma Gonzales, Judge Presiding

Opinion by: Rebeca C. Martinez, Justice

Sitting: Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed: April 1, 2020

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

### BACKGROUND

Continental Motors, Inc. ("Continental") is an aircraft engine manufacturer. Danbury

Aerospace, Inc. ("Danbury"[1]) was its competitor. In March 2015, Danbury and Continental

entered into an Asset Purchase Agreement ("APA") under which Continental would acquire

---

[1] We use the term "Danbury" to refer to Danbury Aerospace, Inc. as well as its former subsidiaries Airmotive Engineering Corporation, Engine Components International, Inc., EC Services, Inc., Precision Machined Airparts, Inc., Sterling Machinery & Process, Inc., and Aircooled Motors, Inc.

substantially all of Danbury's operating assets. Among other provisions, the APA required Continental to deposit $2.4 million into an escrow account, the "Indemnity Escrow Fund." Any amount in the Indemnity Escrow Fund not subject to a valid claim by Continental two years after closing would be paid to Danbury.

In May 2015, Danbury and Continental executed an addendum to the APA (the "May Addendum"), and the transaction officially closed in July 2015. Following closing, a series of disputes arose between Continental, Danbury, and various third parties. As a result, Continental agreed that any future claim that it may have against the Indemnity Escrow Fund would be limited to $571,129.66.

Danbury then filed the present suit against Continental seeking to enjoin Continental from destroying certain business records belonging to Danbury that were in Continental's possession. Continental counterclaimed and asserted it was entitled to recover $571,129.66 from the Indemnity Escrow Fund. According to Continental, the $571,129.66 was comprised of five categories of funds: $57,339.08 for purchase order clearing balances; $187,400.23 for vacation and sick time accrual; $70,731.40 for customer deposits; $182,380.06 for accounts payable invoices; and $73,278.89 for warranty claims. Danbury moved for a partial summary judgment as to all categories, except as to the warranty-claims category for $73,278.89. Danbury also sought to have Continental's "damages," if any, limited by $80,000. According to Danbury, the APA authorized recovery from the Indemnity Escrow Fund only after Continental's "damages" exceeded $80,000 (the "threshold amount"). Continental opposed Danbury's motion for partial summary judgment on all grounds, except as to the category comprising the purchase order clearing balances for $57,339.08. The trial granted partial summary judgment in favor of Danbury on four categories of funds: $57,339.08 for purchase order clearing balances; $187,400.23 for vacation and sick time accrual; $70,731.40 for customer deposits; and $182,380.06 for accounts payable invoices. The

trial court also granted partial summary judgment in favor of Danbury as to the $80,000 threshold amount.[2]

At the bench trial that followed, the trial court ruled in Danbury's favor on issues pertaining to Danbury's business-records claim and Danbury's request for attorneys' fees. The trial court signed a final judgment and ordered all funds remaining in the Indemnity Escrow Fund, which totaled $571,129.66, be released to Danbury. The trial court also awarded Danbury $157,799 in attorneys' fees, as well as conditional appellate attorneys' fees.

On appeal, Continental contends the trial court erred in awarding to Danbury all of the funds remaining in the Indemnity Escrow Fund. Continental also challenges the attorneys' fees award. We first review the trial court's partial summary judgment ruling as to three categories of funds: $187,400.23 for vacation and sick time accrual; $70,731.40 for customer deposits; and $182,380.06 for accounts payable invoices. We then consider the warranty-claims category for $73,278.89; this category was not directly addressed in the partial summary judgment order or litigated at trial.[3] Last, we consider attorneys' fees.

## PARTIAL SUMMARY JUDGMENT

A.     STANDARD OF REVIEW & APPLICABLE LAW

We review a trial court's order granting summary judgment de novo. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017). Summary judgment is appropriate when the movant has shown there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 681. When reviewing a summary judgment, we take

---

[2] In addition, the trial court granted Danbury's motion for partial summary judgment as to the release of all funds in excess of $571,129.66 from the Indemnity Escrow Fund, which was approximately $1.6 million. Those funds have been released to Danbury and are not at issue in this appeal.

[3] We do not address the fifth category of funds, $57,339.08 for purchase order clearing balances, because the trial court's award of these funds to Danbury is not in dispute. Likewise, we do not address Danbury's business-records claim because the parties do not appeal the trial court's judgment as to that claim.

evidence favorable to the nonmovant as true, and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* at 680. If the trial court's order does not specify the grounds relied upon for granting summary judgment, we must affirm the summary judgment if any of the grounds advanced are meritorious. *Id.*

This appeal requires that we construe certain provisions of the parties' written contract. When interpreting a written contract, "the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To ascertain the true intentions of the parties, the court must "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Id.* A contract's plain language controls, and "we assign terms their ordinary and generally accepted meaning unless the contract directs otherwise." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). If the contract is so worded that the court may give it a certain or definite legal meaning or interpretation, then the contract is not ambiguous, and the court may construe it as a matter of law. *Coker,* 650 S.W.2d at 393.

B. DISCUSSION

*VACATION/SICK TIME ACCRUAL*

All of Danbury's employees were terminated by Danbury at the time the transaction closed. Following closure, Continental, at its discretion, hired several of Danbury's former employees. These employees had accrued vacation and sick leave during their tenure with Danbury. When Continental hired Danbury's former employees, Continental voluntarily credited Danbury's former employees with any unused vacation and sick time they had accrued while employed at Danbury. Continental sought to recover $187,400.23 from the Indemnity Escrow Fund for the vacation and sick time it credited.

In its motion for summary judgment and on appeal, Danbury argues that Continental cannot recover this particular amount from the Indemnity Escrow Fund because the APA does not authorize recovery of these purported liabilities from the Indemnity Escrow Fund.  We agree.

Continental's right to recover from the Indemnity Escrow Fund is governed by section 3.2(b) and article 10 of the APA.  Neither party argues the relevant provisions are ambiguous, nor do the parties offer differing interpretations.  Section 3.2(b) of the APA states that Continental "may recover from the Indemnity Escrow Fund amounts due to [Continental] under [a]rticle 10, which amounts shall be [Continental's] sole recourse for indemnity claims[.]"  Thus, pursuant to the plain language of section 3.2(b), we must look to article 10 to determine whether Continental may recover from the Indemnity Escrow Fund for the vacation and sick time it credited.

Article 10 governs indemnification.  Continental's claim to recover the credited vacation and sick time is not an indemnity claim as that term is generally understood.  *See, e.g.*, *Claybar v. Samson Expl., LLC*, No. 09–16–00435–CV, 2018 WL 651258, at *3 (Tex. App.—Beaumont Feb. 1, 2018, pet. denied) (mem. op.) (noting an indemnity provision does not apply to a claim between the parties to the agreement; instead, the appellant "had to show that a third party had filed a claim against [the appellant] to prove that the indemnity provision applied"); *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 63 (Tex. App.—San Antonio 2005 pet. denied) ("An indemnity provision does not apply to claims between the parties to the agreement, but obligates the indemnitor to protect the indemnitee against claims brought by third parties."). Section 10.1, which governs indemnity by Danbury, states Danbury agrees:

> to indemnify and hold harmless [Continental] . . . from and against any loss, damage or expense . . . (collectively, "Damages") suffered by . . . [Continental], resulting from:
>
> (a) any inaccuracy or misrepresentation in or breach of any of the representations, warranties or covenants made by [Danbury] or any Shareholder herein or in any Schedule hereto;

(b) any inaccuracy or misrepresentation in or breach of any certificate or other agreement referenced in Section 5.1 hereof delivered by [Danbury] . . . ;

(c) any suit (other than one covered by Section 10.1(d)) in which [Continental] is involved alone or in conjunction with [Danbury] and/or any Shareholder, and resulting directly or indirectly from the actual or alleged failure of [Danbury] to pay any of the actual or alleged liabilities or obligations of [Danbury] or to fulfill any actual or alleged contractual obligation of [Danbury] not assumed by [Continental] pursuant to this Agreement; or

(d) any claim, demand, administrative proceeding or suit against [Continental] arising out of the manufacturing or sale of products or the performance of services by [Danbury], including, without limitation, . . . (iii) warranty claims to the extent such claim or liability is determined to be based on fault or failure of parts manufactured or sold or services performed by [Danbury].

Section 10.4 states Continental's recovery for "damages" is limited solely to the Indemnity Escrow Fund. Thus, according to the plain language of article 10, Danbury must indemnify Continental from and against any damages suffered by Continental resulting from the actions and omissions identified in subsections (a), (b), (c), and (d). Continental's claim to recover the credited vacation and sick time does not fall within any of the subsections, and Continental does not argue that it does. As such, Continental cannot recover the credited vacation and sick time from the Indemnity Escrow Fund.

Continental argues, however, that sections 3.2(b) and 10.1 are inconsistent with schedule 3.3 of the May Addendum and, therefore, are implicitly superseded. We disagree. It is only when the terms of one writing are so inconsistent with a later writing "that the two cannot subsist together is there a presumption that the second super[s]eded the first." *IP Petroleum Co., Inc. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 899 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Here, there is no inconsistency between the provisions. Sections 3.2(b) and 10.1 govern when Continental may recover from the Indemnity Escrow Fund, while schedule 3.3 provides that Danbury is responsible for the payroll expense of its employees through the closing date. Moreover, section 15.4 of the APA provides that the APA and its associated schedules, including schedule 3.3, should be construed together to the same extent as if such schedules were fully set

forth in the APA. *See id.* ("Instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times.").

In effect, Continental argues that the accrued vacation and sick time is a "payroll expense" that Danbury is responsible for under schedule 3.3, and, if Danbury is responsible, Continental must have a right to reimbursement from the Indemnity Escrow Fund. However, the contract does not provide that Continental may look to the Indemnity Escrow Fund for recovery of every purported liability. Continental does not argue that any particular provision in the APA or associated schedules entitle it to recover a purported payroll liability *from the Indemnity Escrow Fund*, and, as discussed above, the relevant contract provisions do not allow for recovery from this fund. *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 646 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (explaining that a court must enforce the contract as written).

We conclude Continental's claim to recover the credited vacation and sick time does not fall within any of the subsections of section 10.1, and, thus, Continental cannot recover from the Indemnity Escrow Fund. Accordingly, because Danbury established that it was entitled to judgment as a matter of law, the trial court's partial summary judgment ruling as to the category of funds representing $187,400.23 for accrued vacation and sick time is affirmed. *See Hansen*, 525 S.W.3d at 681.

### *CUSTOMER DEPOSITS*

Under section 3.3(a) of the APA, Continental assumed the obligation to provide to Danbury's customers any goods and services not yet delivered or performed by Danbury as of the closing date. Continental fulfilled this obligation; however, some of these customers allegedly paid Danbury for the completed work instead of Continental. Continental sought to recover these customer payments from the Indemnity Escrow Fund in the amount of $70,731.40.

Relying on section 1.1(f) of the APA, Continental argues it purchased "all prepayments, deposits and other consideration paid by customers in connection with purchase and work orders to be assumed by" Continental. Thus, according to Continental, any customer payments made to Danbury for work assumed, and subsequently performed, by Continental belongs to Continental. Danbury again argues Continental's right to recover from the Indemnity Escrow Fund is governed by sections 3.2(b) and 10.1 and, even assuming a valid claim, such claim does not qualify for recovery from the Indemnity Escrow Fund. We agree.

As with the accrued vacation and sick time, Continental similarly does not argue that recovery for the customer payments falls within the plain language of section 10.1 or that any other provision of the APA applies. We conclude Continental cannot recover these customer deposits from the Indemnity Escrow Fund.

Accordingly, because Danbury established that it was entitled to judgment as a matter of law, the trial court's partial summary judgment ruling as to the category of funds representing $70,731.40 for customer deposits is affirmed. *See id.*

### ACCOUNTS PAYABLE INVOICES

Continental alleged it paid $1,182,380.06 in accounts payable invoices ("payables") on Danbury's behalf, and it sought to recover $182,380.06 from the Indemnity Escrow Fund for payables paid in excess of $1 million.

Under section 3.3(a) of the APA, Continental assumed "the trade payable obligations of [Danbury] . . . listed on Schedule 3.3." Schedule 3.3(d)(i) of the May Addendum states that the maximum aggregate amount of payables assumed by Continental is $1 million. Schedule 3.3(d)(iv) provides that Danbury is responsible for payables in excess of the maximum aggregate amount of $1 million ("excess payables"). Schedule 3.3(d)(iv) further states:

> To the extent determined by [Continental] in its sole discretion to be desirable to preserve business relationships, [Continental] may in its discretion pay for the account of [Danbury] any such [excess] payable that is not promptly paid by [Danbury] and is not disputed by [Danbury]. [Danbury] will promptly reimburse [Continental] upon request for any payment so made, and failing such reimbursement [Continental] may obtain such reimbursement from the Escrow Fund without application of any escrow deductible.

In its summary judgment motion and on appeal, Danbury does not dispute that Continental may seek reimbursement from the Indemnity Escrow Fund for excess payables that were paid on Danbury's behalf. Rather, Danbury argues that Continental failed to comply with schedule 3.3(d)(iv). Danbury claims Continental first had to determine whether Danbury paid or disputed the payable before Continental could exercise its discretion in paying an excess payable. Because Continental failed to determine whether Danbury paid or disputed the payable before exercising its discretionary authority, Danbury argues, Continental is not entitled to reimbursement from the Indemnity Escrow Fund.

Section 3.3(a) and schedule 3.3(d)(i) provide, by their plain language, that Continental would assume Danbury's payables until the total aggregate amount paid by Continental reached $1 million. Pursuant to schedule 3.3(d)(iv), Danbury was responsible for paying any payable in excess of the $1 million total. Schedule 3.3(d)(iv) then states Continental has the discretion to pay for any payable in excess of the $1 million total "*that is not promptly paid by [Danbury] and is not disputed by [Danbury]*." (emphasis added). In other words, Continental has the discretion to pay for any excess payable not promptly paid and not disputed by Danbury. Continental's discretionary authority was, therefore, contingent on whether the excess payable was (1) promptly paid by Danbury and (2) disputed by Danbury. It follows then that Continental had to determine whether the excess payable was (1) paid by Danbury and (2) disputed by Danbury before it could exercise its discretion in paying the payable.

Continental argues it had the sole discretion to pay excess payables because its discretion is twice mentioned by schedule 3.3(d)(iv): "To the extent determined by [Continental] in its sole discretion to be desirable to preserve business relationships, [Continental] may in its discretion pay for the account of [Danbury] any such [excess] payable that is not promptly paid by [Danbury] and is not disputed by [Danbury]." However, Continental's interpretation negates the second half of the sentence. If we were to conclude that Continental could exercise its discretion over any and all excess payables, without first considering whether the payable was paid or disputed by Danbury, it would render the second half of the provision meaningless. *See Coker*, 650 S.W.2d at 394 ("Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless."). It is only when the excess payable was not paid by Danbury and not disputed by Danbury, that Continental could exercise its discretion and pay for the payable.

However, our contract interpretation does not resolve the issue. There is some evidence indicating that Continental may have exercised its discretionary authority in accordance with schedule 3.3(d)(iv). Danbury and Continental presented deposition excerpts on the matter.

In support of its summary judgment motion, Danbury provided the testimony of Brenda Steward, a plant controller with Continental. Steward oversaw various accounting functions for various Continental entities. Steward was aware that Continental was responsible for paying $1 million in payables and that anything over the $1 million total was Danbury's responsibility. Steward was instructed to continue paying even when the total aggregate amount paid by Continental exceeded $1 million. When asked whether there was a procedure that needed to be followed before paying an excess payable, Steward stated there was not a clear procedure. Steward testified she occasionally sent an email to Danbury's president, notifying him when an excess payable had been paid by Continental. Steward stated she was not instructed to send invoices of

excess payables to Danbury before payment.  Steward further stated there were a few times she did send Danbury's president an invoice for an excess payable prior to paying it and Danbury's president responded by instructing Continental to pay the payable, but, most of the time, approval by Danbury was not sought prior to payment.

Danbury provided the testimony of Carmen Woodham, a controller with Continental. Woodham managed Continental's accounting department.  Woodham instructed Steward to continue paying Danbury's payables even when the total aggregate amount paid by Continental exceeded $1 million.  Woodham agreed that after the $1 million total was met, there was a requirement to consult with Danbury in order to (1) give Danbury the opportunity to pay the excess payable and (2) to find out if it was disputed by Danbury.  According to Woodham, this was "consistently done" through regular emails sent to Danbury's president.  Woodham stated she requested payment from Danbury for excess payables and that Danbury's president instructed her to "just add it to the escrow account."  Woodham did not know if any specific invoice was presented to Danbury before payment by Continental.

Viewing this evidence in the light most favorable to Continental and indulging every reasonable inference in its favor, there is some evidence indicating that, prior to paying an excess payable, Continental may have determined, based on communications with Danbury, that Danbury would not pay or dispute the payable.  Whether this was done each time Continental paid an excess payable or just on occasion is not conclusively established by the summary judgment evidence. There is also some evidence indicating that Danbury may have chosen to not pay or dispute an excess payable when it was presented prior to payment, and instead, instructed Continental to pay the payable on its behalf or to add the payable amount to the escrow account.  Because there is some evidence indicating that Continental may have exercised its discretionary authority in accordance with schedule 3.3(d)(iv), Danbury has failed to conclusively establish that Continental

is not entitled to reimbursement from the Indemnity Escrow Fund for the excess payables that were paid on Danbury's behalf.

Accordingly, because Danbury did not establish that it is entitled to judgment as a matter of law, the trial court erred in granting partial summary judgment as to the category of funds representing $182,380.06 for accounts payable invoices. *See Hansen*, 525 S.W.3d at 681.

### FINAL JUDGMENT ORDER

Danbury's motion for partial summary judgment and the trial court's order granting partial summary judgment did not address the category of funds representing $73,278.89 for warranty claims (the "warranty-claims category"), nor was the warranty-claims category litigated at the subsequent bench trial. Because this category of funds remained outstanding until entry of the final judgment, we consider whether the trial court erred in awarding these funds to Danbury pursuant to its final judgment, which ordered that all remaining funds in the Indemnity Escrow Fund be released to Danbury.

#### *WARRANTY CLAIMS*

Continental alleged it provided credits and services to Danbury's customers in satisfaction of customer warranties. In connection with these warranty claims, Continental sought to recover $73,278.89 from the Indemnity Escrow Fund.

Shortly after the trial court granted Danbury's motion for partial summary judgment, the case proceeded to a bench trial, after which the trial court ruled in favor of Danbury on Danbury's business-records claim and Danbury's request for attorneys' fees. The trial court signed an order of final judgment, incorporating the prior summary judgment orders, and ordering that Danbury recover all remaining funds in the Indemnity Escrow Fund and that Continental take nothing on its counterclaims. The order of final judgment states: "[A]ll relief requested by any party and not

expressly granted herein is hereby DENIED. This a final, appealable judgment which disposes of all claims and parties."

This capstone language in the final judgment unequivocally demonstrates that the trial court intended to render a final and appealable judgment that disposed of all claims before it. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 206 (Tex. 2001). However, Danbury's motion for partial summary judgment and the trial court's order granting partial summary judgment did not specifically address the warranty-claims category for $73,278.89, nor was the warranty-claims category litigated at the subsequent bench trial. Thus, the trial court, through its final judgment order, either impliedly ruled on Continental's claim to recover the warranty-claims category or failed to adjudicate it.

Danbury argues that the trial court did not fail to adjudicate Continental's claim to recover the warranty-claims category because Continental had abandoned this claim prior to the rendition of final judgment. We agree.

Whether a claim has been abandoned is a question of law that we review de novo. *In re J.M.*, 352 S.W.3d 824, 826 (Tex. App.—San Antonio 2011, no pet.). "A party who abandons any part of his claim or defense, as contained in the pleadings, may have that fact entered of record, so as to show that the matters therein were not tried." TEX. R. CIV. P. 165. A stipulation may demonstrate abandonment of a claim, and formal amendment of a party's pleadings is not required. *In re J.M.*, 352 S.W.3d at 826. "A stipulation is an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys respecting some matter incident thereto." *Id.* at 826–27.

> In any case, the issues to be tried may be limited or excluded by stipulation. Where a stipulation limits the issues to be tried or considered by the [trial court], those issues are excluded from consideration. If the stipulation is ambiguous or unclear, it should be disregarded by the trial court. In construing a stipulation, a court must determine the intent of the parties from the language used in the entire agreement,

examining the surrounding circumstances, including the state of the pleadings, the allegations made therein, and the attitude of the parties with respect to the issue.

*Laredo Med. Grp. v. Jaimes*, 227 S.W.3d 170, 174 (Tex. App.—San Antonio 2007, pet. denied) (internal citations omitted).

Here, the record reflects Continental limited the issues to be tried or considered by the trial court by stipulation, and thereby abandoned its claim to the warranty-claims category and excluded the issue from the trial court's consideration. *See id.* Shortly after the trial court granted Danbury's motion for partial summary judgment, Danbury and Continental entered into a rule 11 agreement, in which the "parties acknowledge[d] that all issues, except Danbury's claim to preserve and recover records and Danbury's claim to recover attorney's fees, have been resolved by summary judgment in favor of Danbury[.]" Neither party contests the validity of the rule 11 agreement, and it is undisputed that the agreement was in writing, signed by both parties, and filed with the court as part of the record. *See* TEX. R. CIV. P. 11 (listing the requirements for an enforceable rule 11 agreement). The case then proceeded to a bench trial, where counsel for Continental explained to the trial court in its opening statement what issues were before the court: "So what are the issues at trial? Disposition of the records, and Danbury's request for attorney's fees." *See Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 822–23 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (determining a strict liability claim was abandoned when trial counsel advised the trial court that the only remaining issues were claims for gross negligence and damages). Additionally, the testimony and evidence offered by Continental at the bench trial focused exclusively on Danbury's business-records claim and Danbury's request for attorneys' fees. *Cf. In re C.C.J.*, 244 S.W.3d 911, 921–22 (Tex. App.—Dallas 2008, no pet.) (finding a claim was not abandoned by a party when the testimony at trial largely pertained to the allegedly abandoned claim).

Continental argues it was effectively precluded from pursuing its claim on the warranty-claims category at trial because the trial court's partial summary judgment order imposed an $80,000 threshold amount for "damages" and the warranty-claims category was for an amount below that threshold.[4] However, section 10.5, which establishes the threshold amount, specifically incorporates an exception in section 10.6. Section 10.6 provides, in part, that the threshold amount will not apply to warranty claims.[5] Thus, although the trial court agreed that Continental's "damages," if any, were limited to an amount in excess of $80,000, it had no effect on Continental's ability to recover from the Indemnity Escrow Fund for its warranty claims because the threshold amount does not apply to "damages" resulting from warranty claims. Indeed, Continental recognized in its summary judgment response that "regardless of how the court rules on [Danbury's] motion for partial summary judgment, the . . . [warranty-claims category] will still be in dispute."

In light of this record, we conclude Continental's claim to the category of funds representing $73,278.89 for warranty claims was abandoned by stipulation. *See Laredo Med. Grp.*, 227 S.W.3d at 174. The APA provides that any amounts in the Indemnity Escrow Fund not subject to a claim by Continental be released to Danbury. Because Continental abandoned its claim to the warranty-claims category through stipulation, the amount of $73,278.89 was no longer subject to a claim by Continental, and the trial court did not err in awarding those funds to Danbury.

---

[4] Section 10.5 provides: "Except as provided in [s]ection 10.6, [Danbury] . . . shall not be required to indemnify [Continental] for Damages until the aggregate amount of such Damages exceeds Eighty Thousand Dollars ($80,000.00), in which case [Danbury] . . . shall only be responsible for Damages exceeding the foregoing amount." The "damages" referenced in section 10.5 are described in section 10.1, which we have reproduced in the text above.
[5] Section 10.6 provides that section 10.5 "shall not apply to claims against [Danbury] . . . for Damages arising from (i) matters indemnified under [s]ection 10.1(d) . . . ." Section 10.1(d) concerns warranty claims.

**ATTORNEYS' FEES**

Last, we consider attorneys' fees. In its conclusions of law, the trial court determined Danbury was the prevailing party on all claims, that Danbury was entitled to all remaining funds in the Indemnity Escrow Fund, and that Danbury recovered all relief sought. It awarded Danbury the full amount it requested: $154,799 in attorneys' fees and an additional $94,800 in conditional appellate attorneys' fees. As discussed, the trial court awarded Danbury recovery of $571,129.66 from the Indemnity Escrow Fund, and, in this opinion, we reverse and remand as to $182,380.06 in the Indemnity Escrow Fund, which represents the dispute that remains over accounts payable invoices.

In awarding an amount in attorneys' fees, the trial court should consider a number of factors, including the amount involved and the amount awarded. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). "[T]he issue of attorney's fees should be retried if the [amounts] awarded are reduced on appeal" unless the appellate court is "reasonably certain that the [trial court] was not significantly influenced by the erroneous" merits award. *See Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (quoting *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006)).

Here, we are not reasonably certain that the trial court's attorneys' fees award was not significantly influenced by the erroneous award of $182,380.06. *See id.* Accordingly, we reverse the judgment of the trial court as to the issue of attorneys' fees and remand the matter for a redetermination. *See id.* at 314–15.

**CONCLUSION**

We reverse the trial court's final judgment insofar as it awards to Danbury $182,380.06 from the Indemnity Escrow Fund, which represents the dispute that remains over accounts payable invoices, and insofar as it awards Danbury attorneys' fees. We affirm the trial court's final

judgment in all other respects, which includes an award of $388,749.60 from the Indemnity Escrow Fund to Danbury.  We remand for further proceedings consistent with this opinion.

Rebeca C. Martinez, Justice